UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNIQUE LOTUS GEMS and                           ECF CASE
GEMDIAM,

                Plaintiffs,             Case No. 18-cv-10808 (AT) (GWG)

   –against–                            **PROPOSED FINDINGS OF FACT**
                             **AND CONCLUSIONS OF LAW**
GHOLIAN ENTERPRISES INC.,
FARID GHOLIAN a/k/a ROB
GHOLIAN, and AHARON
AKUSH,

             Defendants.
----------------------------------------------------x

      Pursuant to the Order of the Hon. Analisa Torres, dated June 19, 2019, which granted

plaintiffs' motion for a default judgment against all three defendants herein, and the Scheduling

Order for Damages Inquest of the Hon. Gabriel W. Gorenstein, dated June 20, 2019, plaintiffs,

Unique Lotus Gems ("Unique Lotus") and Gemdiam, by their attorneys, Kazlow & Kazlow,

hereby propose the following findings of fact, and conclusions of law, relating to their damages:

## PROPOSED FINDINGS OF FACT

### Background Facts

      1. Plaintiffs, Unique Lotus and Gemdiam, are Hong Kong companies that trade in

precious gem stones (Complaint, pp. 1-2, par. 1-2, 7; S. Jain Dec., p. 1, par. 2; A. Jain Dec., p. 1,

par. 2).[1]

---

[1] Numerical references preceded by "Complaint" are to plaintiffs' Complaint dated
November 19, 2018.  Numerical references preceded by "S. Jain Dec.," "A. Jain Dec." and
"Shuffman Dec." are respectively to the the Declaration of Sunil Jain, dated June 28, 2019, the
Declaration of Arun Jain, dated July 11, 2019, and the Declaration of David K. Shuffman, Esq.,
dated July 10, 2019.  Alphabetical references preceded by "S. Jain Ex.," "A. Jain Ex.," and
"Shuffman Ex." are respectively to the exhibits annexed to the declarations of Sunil Jain, Arun
Jain and David K. Shuffman, Esq.

2. Defendant, Gholian Enterprises Inc. ("Gholian Enterprises"), is a New York corporation that imports precious gem stones from abroad and sells them in the United States (Complaint, pp. 1-2, par. 3, 8).

3. Defendants, Farid Gholian a/k/a Rob Gholian ("Gholian"), and Aharon Akush ("Akush") are the shareholders, directors, officers and/or managers of Gholian Enterprises (Complaint, p. 2, par. 4-5, 9; S. Jain Dec., p. 1, par. 3; A. Jain Dec., p. 1, par. 3).

4. In 2016, Gholian and Akush visited each of the plaintiffs in Hong Kong, and purchased gem stones for Gholian Enterprises, leaving post-dated checks as security for payment (Complaint, p. 3-4, 10, par. 11-13, 37; S. Jain Dec., p. 2, par. 4-6; S. Jain Ex. A-B; A. Jain Dec., p. 2, par. 5; A. Jain Ex. A).

5. Gholian and Akush subsequently returned to the plaintiffs' offices, paid for their initial purchases in cash, and took back their post-dated checks (Complaint, pp. 4, 10, par. 14-15, 38; S. Jain Dec., pp. 2-3, par. 7; A. Jain Dec., p. 2, par. 6; A. Jain Ex. A).

6. Having thereby obtained the plaintiffs' trust, Gholian and Akush then began to purchase, and to take on consignment, from both Unique Lotus and Gemdiam, larger, more expensive gem stones, and larger quantities of smaller gem stones, worth hundreds of thousands of dollars in total, leaving more post-dated checks as security for payment (Complaint, pp. 4-6, 10-11, par. 16, 18, 20-21, 39, 41-42; S. Jain Dec., p. 3-4, par. 8-9, 11, 25; S. Jain Ex. C-H; A. Jain Dec., pp. 2-4, par. 8-10, 14, 29; A. Jain Ex. B-G).

7. With respect to the gem stones taken on consignment from Unique Lotus, on August 15, 2016 and September 13, 2016, Akush signed "On Trust" memoranda bearing a legend stating that, "I/We received On Trust from Unique Lotus Gems Kowloon, Hong Kong The following

2

gems/jewellery as mentioned below.  This/These remain the property of Messrs Unique Lotus Gems and I/We promise to return it/them at first notice.  I/We hold myself/ourselves responsible for any loss or damage, till the above Trust is discharged" (Complaint, p. 5-6, par. 18, 21; S. Jain Dec., pp. 3-5, par. 9, 11; S. Jain Ex. E, H).

8. With respect to the gem stones taken on consignment from Gemdiam on December 22, 2016, Akush signed a Receipt & Bailment Note which states, "Received the above goods from GEMDIAM on trust and bailment.  These goods are returnable and remain the property of 'GEMDIAM' unless paid for and I/We are responsible for the loss or damage of the goods due to any cause whatsoever" (Complaint, p. 11, par. 42; A. Jain Dec., p. 3, par. 10; A. Jain Ex. E).

9. However, when the defendants failed to pay for their purchases and consignments as agreed, Unique Lotus discovered, when it deposited one of the defendants' post-dated checks, in or about October 2016, that there was insufficient funds in Gholian Enterprises' account to cover the checks (Complaint, p. 6, par. 23; S. Jain Dec.,p. 5, par. 13; S. Jain Ex. I-J).

10. Gemdiam was also advised by Akush, on or about February 6, 2017, that the post-dated checks it was holding were no good, and should not be deposited (Complaint, p. 13, par. 50; A. Jain Dec., pp. 5-6, par. 19).

11. Subsequently, on or about June 12, 2017, Akush delivered twelve post-dated replacement checks to Gemdiam in the total amount of $240,000.00, to cover Gholian Enterprises' debt, but Gemdiam learned, when it deposited the first replacement check on or about July 10, 2017, that the account at China Citik Bank against which they were drawn was a closed account (Complaint, p. 14, par. 54-55; A. Jain Dec., p. 7, par. 23-24; A. Jain Ex. K-L).

12. Akush also told both Unique Lotus and Gemdiam that some of their consigned gem

3

stones had been pawned by a customer's son, and persuaded the owners of Unique Lotus and Gemdiam that they needed to pay various third-parties to redeem the stones (Complaint, pp. 7-8, 12-14, par. 26-29, 48, 51-52, 54; S. Jain Dec., pp. 6-7, par. 15-17; A. Jain Dec., pp. 4-7, par. 16, 21, 23; A. Jain Ex. I-J).

13. Thus, on or about February 10, 2017, Unique Lotus was induced to pay $40,000.00 in cash to recover three emeralds and two rubies, worth a total of $86,648.50 from two unidentified men in an office in New York's diamond district by Akush's unfulfilled promise to reimburse Unique Lotus for its payment (Complaint, pp. 7-8, par. 26-30; S. Jain Dec., pp. 6-7, par. 15-17; S. Jain Ex. E, H; Shuffman Dec., pp. 1-2, par. 3-5).

14. Similarly, on or about February 6, 2017, Akush convinced Gemdiam to pay $52,000.00 in cash, to Akush, to redeem two emeralds worth a total of $92,644.00 (Complaint, p. 12, par. 48; A. Jain Dec., pp. 4-5, par. 16; A. Jain Ex. B).

15. In addition, in or about June 2017, Akush persuaded Gemdiam to pay $120,000.00, that Gemdiam's owner had to borrow from his brother-in-law's company, Gem Wave Inc., to a company named Gold 7 of Miami LLC ("Gold 7"), in order to redeem an 11.86 carat emerald worth $237,200.00 (Complaint, pp. 13-14, par. 51-54; A. Jain Dec., pp. 3, 6-7, par. 9, 20-23; A. Jain Ex. D, I-J).

16. Gholian Enterprises later revealed, in a pleading verified by Gholian in an action that it brought against Gold 7 in a Florida state court, that the 11.86 carat emerald had never been pawned - - it had actually been consigned to Gold 7, for only $180,000.00, *i.e.* $57,200.00 less than Gholian Enterprises  was required to pay Gemdiam, on or about January 10, 2017, which was only nineteen days after December 22, 2016, the date on which it was acquired by Gholian

4

Enterprises from Gemdiam - - and that Gold 7 failed to turn any portion of Gemdiam's $120,000.00 redemption payment over to Gholian Enterprises (Complaint, p. 11, par. 44; A. Jain Dec., pp. 3, 7-8, par. 9, 28; A. Jain Ex. D; Shuffman Dec., pp. 3-4, par. 11-12; Shuffman Ex. C [Am. Ver. Compl., pp. 5-6, par. 38-42; Am. Ver. Compl. Ex. F-G]).

17. Gemdiam has not been able to resell any of the emeralds that it redeemed (A. Jain Dec., p. 5, 8, par. 18, 26).

18. On or about February 16, 2017, at the law office of an attorney named David K. Shuffman ("Shuffman"), Gholian signed an Agreement in which Gholian Enterprises acknowledged a debt to Unique Lotus totaling $303.062.00, including $190,396 for gem stones that Gholian Enterprises and purchased, and $112,666.00 for gem stones that Gholian Enterprises had taken on consignment (the "Agreement")(Complaint, p. 8, par. 31; S. Jain Dec., pp. 7-8, par. 18; S. Jain Ex. L; Shuffman Dec., p. 2, par. 6-7).

19. The Agreement required Gholian Enterprises to pay of its debt to Unique Lotus at the rate of $15,000.00 per month beginning on April 10, 2017, for which purpose Gholian signed and delivered thirteen post-dated checks payable to Shuffman from a Gholian Enterprises account at Citibank (Complaint, p. 2, par. 7-8; S. Jain Dec., p. 8, par. 19; S. Jain Ex. M; Shuffman Dec., p. 2, par. 7-8).

20. However, when Shuffman deposited the first post-dated check, on or about April 10, 2017, he was informed that payment had been stopped, and when he deposited the second post-dated check, on or about May 10, 2017, he was notified that Gholian Enterprises' account had been closed (Complaint, p. 9, par. 33; S. Jain Dec., p. 8, par. 20; Shuffman Dec., pp. 2-3, par. 9; Shuffman Ex. A-B).

21. Shuffman sent a default letter to Gholian on or about April 18, 2017, but Gholian Enterprises failed to make any payments to Unique Lotus to cure its default (Complaint, p. 9, par. 34; S. Jain Dec., p. 8, par. 20; Shuffman Dec., p. 3, par. 9).

## The Plaintiffs' Losses from Their Transactions with the Defendants

### Unique Lotus' Losses

22. Unique Lotus is entitled to debits in the total amount of $422,828,79 against the defendants, as follows:

A. $32,904.00, which is the total price of two sapphires sold and delivered on or about June 27, 2016 (S. Jain Dec., pp. 2, 9, par. 6, 22; S. Jain Ex. B);

B. $46,512.00, which is the price of a 16.32 carat sapphire sold and delivered on or about August 15, 2016 (S. Jain Dec., pp. 3, 9, par. 8, 22; S. Jain Ex. C);

C. $101,052.50, which is the total price of four sapphires and two emeralds consigned and delivered on or about August 15, 2016 (S. Jain Dec., pp. 3-4, 9, par. 9, 22; S. Jain Ex. D-E);

D. $47,100.00, which is the total price of two emeralds sold and delivered on or about September 13, 2016 (S. Jain Dec., pp. 4, 9, par. 11, 22; S. Jain Ex. F);

E. $56,966.00, which is the price of a 12.52 carat sapphire sold and delivered on or about September 13, 2016 (S. Jain Dec., pp. 4, 9, par. 11, 22; S. Jain Ex. G);

F. $98,262.00.00, which is the total price of five gem stones consigned and delivered on or about September 13, 2016 (S. Jain Dec., pp. 4-5, 9, par. 11, 22; S. Jain Ex. H);

G. $32.29, which is the fee charged by Unique Lotus' bank, on or about October

5, 2016, when one of Gholian Enterprises post-dated checks bounced (S. Jain Dec., pp. 5, 9, par. 13, 22; S. Jain Ex. I-J); and

H. $40,000.00, which is the amount that Unique Lotus paid to redeem five of the consigned stones on or about February 10, 2017 (S. Jain Dec., pp. 6-7, par. 15-17; Shuffman Dec., pp. 1-2, par. 3-5)

23. The defendants are entitled to the following credits, totaling $118,611.70, with respect to Unique Lotus:

A. $11,000.00 paid in cash on or about September 18, 2016 (S. Jain Dec., pp. 5, 9, par. 12, 23);

B. $10,981.60 paid by a wire transfer on or about October 28, 2016 (S. Jain Dec., pp. 5-6, 9, par. 14, 23; S. Jain Ex. K);

C. $9,981.160 paid by another wire transfer on or about November 11, 2016 (S. Jain Dec., pp. 6, 9, par. 14, 23; S. Jain Ex. K); and

D. $86,648.50, which is the total price of the five consigned stones that Unique Lotus redeemed on or about February 10, 2017 (S. Jain Dec., 6, 9, par. 15, 23; S. Jain Ex. E and H).

24. Unique Lotus' losses, from its transactions with the defendants, therefore total $304,217.09, computed as follows:

Debits:

| | |
|---|---|
| price of sapphires sold June 27, 2016 | $ 32,904.00 |
| price of sapphire sold August 15, 2016 | $ 46,512.00 |
| price of sapphires and emeralds consigned August 15, 2016 | $101,052.50 |
| price of emeralds sold September 13, 2016 | $ 47,100.00 |
| price of sapphire sold  September 13, 2016 | $ 56,966.00 |
| price of stones consigned September 13, 2016 | $ 98,262.00 |

| | | |
|---|---|---|
| bank fee for bounced check October 11, 2016 | | $      32.29 |
| redemption payment February 10, 2017 | | $  40,000.00 |
| | | $422,828.79 |
| Less credits: | | |
| payment received September 18, 2016 | $ 11,000.00 | |
| payment received October 28, 2016 | $ 10,981.60 | |
| payment received November 11, 2016 | $   9,981.60 | |
| price of stones redeemed February 10, 2017 | $  86,648.50 | |
| | | ($118,611.70) |
| Total Losses Unique Lotus | | $304,217.09 |

(S. Jain Dec., pp. 8, 10, par. 21, 24).

## **Gemdiam's Losses**

25. Gemdiam is entitled to debits in the total amount of $293,794.00 against the

defendants, as follows:

      A. $52,000.00, which is the amount of cash that Gemdiam paid on or about

February 6, 2017 to redeem the two emeralds that it sold and delivered to the defendants

on or about September 13, 2016 (A. Jain Dec., pp. 2, 4-5, 8, par. 7, 16, 27; A. Jain Ex. B);

      B. $13,894.00, which is the profit that Gemdiam lost as a result of the cancellation

of the sale of the two emeralds that it sold and delivered to defendants on or about

September 13, 2016, *i.e.* the price that the defendants agreed to pay for the emeralds

($92,644.00) minus the cost ($78,500.00) that Gemdiam allocates to the emeralds, which

it cut and polished from rough emeralds acquired in 2015 (A. Jain Dec., pp. 2, 5, 8, par. 7,

18, 27; A. Jain Ex. B, H);

      C. $120,000.00, which is the amount that Gemdiam borrowed from Gem Wave,

on or about June 12, 2017, to redeem the 11.86 carat emerald that it sold and delivered to

the defendants on or about December 22, 2016 (A. Jain Dec., pp. 3, 7-8, par. 9, 23, 27; A.

Jain Ex. D, I-J);

      D. $59,300.00, which is the profit that Gemdiam lost as a result of the cancellation of the sale of 11.86 carat emerald that it sold and delivered to the defendants on or about December 22, 2016, *i.e.* the price that the defendants agreed to pay for the 11.86 carat emerald ($237,200.00), minus the price ($177,900.00) that Gemdiam paid to acquire the 11.86 carat emerald from its supplier, on or about September 17, 2015 (A. Jain Dec., pp. 3, 8, par. 9, 26-27; A. Jain Ex. D, M); and

      E. $48,600.00, which is the unpaid price that the defendants agreed to pay for a 5.40 carat emerald sold on or about January 31, 2017 after having been consigned and delivered on or about December 22, 2016 (A. Jain Dec., p. 3-4, par. 10, 14-15; A. Jain Ex. E-F).

26. The defendants are entitled to a credit in the amount of $46,322.00, which is the amount of a partial payment made on or about December 22, 2016 with respect to the two emeralds that the defendants purchased on or about September 13, 2016 (A. Jain Dec., pp. 2-3, 5, 8, par. 8, 17, 27; A. Jain Ex. B).

27. Gemdiam's losses, from its transactions with the defendants, therefore total $247,472.00, as follows:

Debits:
| | |
|---|---|
| money paid to redeem September 13th Emeralds | $ 52,000.00 |
| lost profit for September 13th Emeralds | $ 13,894.00 |
| money borrowed to redeem 11.86 Carat Emerald | $120,000.00 |
| lost profit for 11.86 Carat Emerald | $ 59,300.00 |
| price of 5.40 Carat Emerald | $ 48,600.00 |
| | $293,794.00 |

Less Credits:
partial payment received December 22, 2016

| | |
|---|---|
| re: September 13th Emeralds | $46,322.00 |
| | ($ 46,322.00) |
| Total Losses Gemdiam | $247,472.00 |

(A. Jain Dec., pp. 8-9, par. 27-28).

### The Plaintiffs' Combined Losses

28. The plaintiffs' combined losses from their transactions with the defendants therefore

total $551,689.09 ($304,217.09 +  $247,472.00).

## CONCLUSIONS OF LAW

### The Legal Basis for Finding the Defendants Liable

### The Standard of Decision

29. The defendants in this case have all been held to be in default by the Order of the

Hon. Analisa Torres, dated June 19, 2019, which granted plaintiffs' motion for a default

judgment.

30. A defendant who defaults is deemed to admit "all 'well-pleaded' factual allegations

contained in the complaint."  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114,137

(2d Cir. 2011); Wowwee Group Limited v. Haoqin, 2019 WL 1316106 *2 (S.D.N.Y. 2019).

31. The " 'district court must accept as true all of the factual allegations of the non-

defaulting party and draw all reasonable inferences in its favor.' " Liberty Mutual Insurance

Company v. Project Tri-Force, LLC, 2019 WL 1349720 *2 (S.D.N.Y. 2019), quoting Belzaire v.

RAV Investigative and Security Services., Ltd., 61 F. Supp. 3d 336,344 (S.D.N.Y. 2014); See

Finkel v. Romanowicz, 577 F.3d 79,84 (2d Cir. 2009).

32. Nevertheless, "because a party in default does not admit conclusions of law, a district

court must determine whether the plaintiff's allegations are sufficient to establish the defendant's

liability as a matter of law. ... The legal sufficiency of these claims is analyzed under the familiar plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)." Liberty Mutual Insurance Company v. Project Tri-Force, LLC, supra (internal citation omitted).

33. Under that standard, a sufficient complaint requires sufficient factual content to "nudge [its] claims across the line from conceivable to plausible" (Bell Atlantic Corp. v. Twombly, supra, 550 U.S. 544,570, 127 S.Ct. 1955,1974, 167 L.Ed.2d 929 [2007]), and not just "'labels, conclusions' or 'a formulaic recitation of the elements of a cause of action.'" Ashcroft v. Iqbal, supra, 556 U.S. at 678, 129 S.Ct. at 1949, quoting Bell Atlantic Corp. v. Twombly, supra, 550 U.S. at 555, 127 S.Ct. at 1965.

34. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged ... The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, supra (internal citation omitted).

### Plaintiff's Claims for Relief

35. Plaintiffs claims in this action include: fraud and aiding and abetting fraud (First Claim, Complaint, pp. 15-18); civil conspiracy (Second Claim, Complaint, p. 18); breach of contracts (Third, Sixth, Eighth, Tenth and Fourteenth Claims, Complaint pp. 19-25, 27); action for the price of goods sold and delivered, pursuant to N.Y. U.C.C. § 2-709 (Fourth and Eleventh Claims, Complaint, pp. 20, 25); unjust enrichment (Fifth and Twelfth Claims, Complaint, pp. 21, 25-26); account stated (Seventh and Thirteenth Claims, Complaint, p. 22, 26-27); promissory

estoppel (Ninth Claim, Complaint, pp. 23-24); and veil piercing (Fifteenth Claim, Complaint, pp. 28-29).

## The Elements of Plaintiffs' Claims

### Fraud

36. "Under New York law, '[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that is was false when made, justifiable reliance by the plaintiff and resulting injury.' " Lerner v. Fleet Bank, N.A., 459 F.3d 273,291 (2d Cir. 2006)(quoted source omitted).

37. A claim for aiding and abetting a fraud is stated where the allegations show, " '(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.' " Id. 459 F.3d at 292.

38. A principal may be vicariously held liable for its agent's fraud, whether the agent's authority is apparent, actual or implied.  See Green v. Beer, 2009 WL 911015 *10 (S.D.N.Y. 2009).

39. "A promise made with a 'preconceived and undisclosed intent not to perform it' may properly form the basis of a fraud-based claim, because it is an allegation of present fact, rather than future intent," at least when the plaintiff can "either: (1) demonstrate a legal duty separate from the duty to perform the contract; (2) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (3) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages."  Lehman v. Garfinkle, 2009 WL 2973207 *9 (S.D.N.Y. 2009); Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954,956, 510 N.Y.S.2d 88,89 (1986).

40. "Given the reluctance of people to admit that they are lying, a present intention not to perform may be inferred from the surrounding circumstances." 2470 Cadillac Resources, Inc. v. DHL Express (USA), Inc., 44 Misc.3d 1208(A), 2014 WL 3376886 (Sup. Ct., N.Y. Co. 2014).

41. The issuance of a bad check constitutes a fraudulent misrepresentation of fact because " 'the act of drawing and delivering a check amounts to a representation that the drawer keeps and account with the drawee and that there are sufficient funds on deposit to meet it.' " Interstate Foods, Inc. v. Lehmann, 2008 WL 4443850 *3 (S.D.N.Y. 2008)(quoted source omitted).

42. The presence of a common scheme and plan can be sufficient to demonstrate the fraudulent nature of the representations made by the defendants. See Moore v. Painewebber, Inc., 306 F.3d 1247,1255 (2d Cir. 2002).

## Civil Conspiracy

43. "In order to sufficiently allege civil conspiracy, a plaintiff must allege (1) an independent actionable tort, (2) a corrupt agreement between two or more parties, (3) an overt act in furtherance of the agreement, (4) the parties' intentional participation in the furtherance of the agreed to plan, and (5) resulting damage or injury." Green v. Beer, supra at *9.

44. The corrupt agreement may be inferred from circumstantial evidence, and when a conspiracy to defraud is alleged, the plaintiff need not allege or prove that each defendant committed every element of the underlying fraud. Maersk, Inc. v. Neewra, Inc., 687 F.Supp.2d 300,319-20 (S.D.N.Y. 2010).

## Breach of Contract

45. To establish a breach of contract by a defendant, a plaintiff must prove: " '(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's

obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defenant's breach.' " Liberty Mutual Insurance Company v. Project Tri-Force, LLC, supra at *3.

### Action for the Price of Good Sold and Delivered

46. N.Y. U.C.C. § 2-709(1)(a) provides that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages ... the price ... of goods accepted." Shaoxing Aceco Blanket Co., Ltd. v. Aceco, Inc., 670 Fed.Appx. 8,9 (2d Cir. 2016).

47. In order to sustain a claim under these sections, the "plaintiff must show that: (1) it had a contract with the buyer; (2) the buyer failed to pay the purchase price; and (3) the buyer accepted the goods." Kasper Global Collection & Brokers, Inc. v. Global Cabinets & Furniture Mfrs. Inc., 952 F.Supp.2d 542,571 (S.D.N.Y. 2013).

48. " 'Acceptance of goods occurs when the buyer ... fails to make an effective rejection' after 'a reasonable opportunity to inspect [the goods].' " Shaoxing Aceco Blanket Co., Ltd. v. Aceco, Inc., supra, quoting N.Y. U.C.C. § 2-606(1)(b).

### Unjust Enrichment

47. The elements of a claim for unjust enrichment are that, " '(1) ... the defendant benefitted; (2) at the plaintiff's expense; and (3) ... equity and good conscience require restitution.' " Federal Treasury Enterprise Sojuzplodoimport v. Spirits International N.V., 400 Fed.Appx. 611,613 (2d Cir. 2010).

48. As an equitable remedy, a claim for unjust enrichment is not available when the plaintiff has an adequate remedy at law. Id.

### Accounts Stated

49. "To recover on an account stated claim under New York law, a plaintiff must prove 'an agreement between the parties to an account based upon prior transactions between them,' which agreement may be implied if either 'a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment.' " Acco Ltd. v. Rich Kids Jeans Corp., 2017 WL 4350576 *6 (S.D.N.Y. 2017), quoting LeBoeuf, Lamb, Greene & MacRae, LLP v. Worsham, 185 F.3d 61,64 (2d Cir. 1999).

50. Under New York law, an account can be stated by the submission of an invoice by a seller to a purchaser and the purchaser's failure to raise timely objections thereto. See e.g. H. Daya International Co., Ltd. v. Arazi, 348 F.Supp.3d 304,311-12 (S.D.N.Y. 2018); Saeco Vending, S.P.A. v. Seaga Manufacturing Inc., 2016 WL 1659132 *6 (S.D.N.Y. 2016).

### Promissory Estoppel

51. "The elements of a promissory estoppel claim under New York law are: '[i] a clear and unambiguous promise; [ii] a reasonable and foreseeable reliance by the party to whom the promise is made; and [iii] an injury sustained by the party asserting the estoppel by reason of the reliance.' " Trodale Holdings LLC v. Bristol Healthcare Investors, L.P., 2019 WL 1300335 *16 (S.D.N.Y. 2019), quoting, Cyberchron Corp. v. Calldata Systems Development, Inc., 47 F.3d 39, 44 (2d Cir. 1995).

### Veil Piercing

52. "To pierce the corporate veil, a plaintiff must establish the following elements:  (1) 'that the owner exercised complete domination over the corporation, and (2) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the

veil.' " Shantou Real Lingerie Manufacturing Co., Ltd. v. Native Group International, Ltd., 2018 WL 1738344 *4 (S.D.N.Y. 2018), quoting, Thrift Drug, Inc. v. Universal Prescription Administrators, 131 F.3d 95, 97 (2d Cir. 1997).

53. "New York courts recognize and apply the doctrine of equitable ownership to veil pierce even against non-owners/non-shareholders of companies ... when there is equitable cause to do so," with the key being "the necessity to provide justice in unjust circumstances." Americore Drilling & Cutting, Inc. v. EMB Contracting Corp., 55 Misc.3d 1207(A), 2017 WL 1318582 (Sup. Ct., Queens Co. 2017)(cite source omitted); See e.g. State v. Easton, 169 Misc.2d 282,289, 647 N.Y.S.2d 904,909 (Sup. Ct., Albany Co. 1995).

54. Various factors may be considered with respect to the question of complete domination, including: " '(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, [and] (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes.' " Shantou Real Lingerie Manufacturing Co., Ltd. v. Native Group International, Ltd., supra, quoting Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131,139 (2d Cir. 1991).

55. "Courts are not required to find that every factor is present, and no one factor is dispositive." Shantou Real Lingerie Manufacturing Co., Ltd. v. Native Group International, Ltd., supra.

### The Defendants' Liability

### Fraud and Civil Conspiracy

56. The Complaint sufficiently alleges, and the plaintiffs have proved through their

written submissions, that Gholian and Akush conspired with each other, and executed a common scheme and plan to fraudulently obtain precious gem stones from the plaintiffs on behalf of their company, Gholian Enterprises, by first making small purchases, for which they paid in full in order to win the plaintiffs' trust, and then making larger purchases, and taking consignments, for which they had no intention of paying, using worthless post-dated checks as security for payment to allay suspicion (Complaint, pp. 15-16, 18, par. 62-64, 73; and see par. 4-10 above, and citations to Complaint, Declarations and Exhibits therein).

57. The defendants failed to pay the plaintiffs in full for those purchases, or to return most of the consigned goods, then lied to the plaintiffs, falsely telling them that their stones had been pawned by a customer's son, in order to persuade the plaintiffs that they needed to pay for the redemption of their consigned gem stones in order to avoid a bigger loss (Complaint, p. 17, par. 65; and see par. 9, 12-15, above, and citations to Complaint, Declarations and Exhibits therein).

58. The falsity of the story concerning the pawning of the consigned stones is confirmed by Gholian Enterprises' own verified pleading in a Florida state court action, in which Gholian Enterprises affirmatively alleged that it sold one of the gem stones in question, an 11.86 carat emerald, to a third party, less than three weeks after Gholian and Akush acquired the stone from Gemdiam, for a price which was $57,200.00 less than Gholian Enterprises agreed to pay Gemdiam (see par. 16, above, and citations to Complaint, Declarations and Exhibits therein).

59. The active participation of both Gholian and Akush in this scheme, and their conspiracy with each other, is amply alleged and established through their joint visits to the plaintiffs business establishments, or to the plaintiffs' booths at trade shows, their signing of invoices and consignment memoranda, their false assurances that payments would be made, and

17

their tender of bad checks, including bad replacement checks drawn on accounts that were closed

before the checks were presented (Complaint, pp. 15-16, par. 62-65; and see par. 4-11, 19-20,

above, and citations to Complaint, Declarations and Exhibits therein).

60. That the defendants knew of the falseness of their representations to the plaintiffs,

including the worthlessness of the post-dated checks that they tendered, and that they intended to

defraud the plaintiffs, can be inferred from all of the circumstances presented (Complaint, pp. 16-

18, par. 63-66,74). See Cortes v. Twenty-First Century Fox America, Inc., 285 F.Supp.3d

629,638-39 (S.D.N.Y. 2018).

61. Furthermore, the plaintiffs have sufficiently alleged and shown that they repeatedly

acted in justifiable reliance on the defendants' representations to their detriment, since the

parties' initial transactions lulled them into trusting the defendants (Complaint, p. 17, par. 67-68;

S. Jain Dec., p. 10, par. 25; A. Jain Dec., .p. 9, 29).

62. Therefore, the defendants are each liable for fraud and civil conspiracy under the

plaintiffs' First and Second claims - - Gholian and Akush because they aided, abetted and

conspired with each other in perpetrating the fraud, and Gholian Enterprises Inc., because it is

vicariously liable for the actions of its agents.

### Breach of Contract, Action for the Price, Accounts Stated and Promissory Estoppel As to Gholian Enterprises

63. Gholian Enterprises' liability for breach of the various contracts or agreements by

which it purchased or received plaintiffs' merchandise on consignment at agreed prices, under

the plaintiffs' Third, Fourth, Tenth and Eleventh claims is sufficiently established by the

allegations and proof concerning the delivery of the plaintiffs' gem stones into the possession of

Gholian and Akush, the contractual terms on the invoices and consignment memoranda that

Gholian and Akush signed, and Gholian Enterprises' failure to pay for all of the merchandise that

it received (Complaint, pp. 19-20, 24-25 par. 78-82, 84-88, 117-121, 123-27; and see par. 6-11,

22-27, above, and citations to Complaint, Declarations and Exhibits therein).

64. Gholian Enterprises' liability for breach of its settlement agreement with Unique

Lotus, under the plaintiffs' Eighth claim, is also sufficiently established by the allegations and

proof concerning Gholian's execution of the agreement, the return of the post-dated checks

delivered by Gholian upon the execution of the agreement, and Gholian Enterprises' failure to

cure its default after being given due notice by Unique Lotus' attorney (Complaint, p. 23, par.

106-08; and see par. 18-21, above, and citations to Complaint, Declarations and Exhibits

therein).

65. Gholian Enterprises' liability upon accounts stated by the plaintiffs, under the

plaintiff's Seventh and Thirteenth claims is similarly established by the allegations and proof

concerning Gholian Enterprises' failure to pay the invoices which Gholian and Akush signed,

without objection, and the agreed settlement amount set forth in the settlement agreement

between Gholian Enterprises and Unique Lotus (Complaint, p. 22, 26-27, par. 101-04, 135-39;

and see par. 6, 9-11, 18-21, above, and citations to Complaint, Declarations and Exhibits

therein).

### As to Akush

66. Akush's liability under the plaintiffs' Eighth and Fourteenth claims for breaching the

terms of the consignment memoranda that he signed, in which he assumed personal liability to

pay for the jewelry that plaintiffs consigned to Gholian Enterprises if it was not returned to the

19

plaintiffs, is also sufficiently established by the allegations and proof concerning his signing of

the memoranda, the delivery of the consigned jewelry into Gholian Enterprises' possession, and

Gholian Enterprises failure to return or pay for some of the consigned gem stones (Complaint,

pp. 23, 27, par. 106-08, 141-43; and see par. 7-8, 22C, 22F, 22H, 23D, and citations to

Complaint, Declarations and Exhibits therein).

67. Akush's liability under the plaintiffs' Ninth claim, for promissory estoppel, is

similarly established by the allegations and proof of his clear promise to personally reimburse

Unique Lotus for its $40,000.00 payment to redeem five of the consigned gem stones, Unique

Lotus' reasonable and forseeable reliance on that promise given that Akush had represented that

the stones had been pawned by a customer's son, and the $40,000.00 cash payment that Unique

Lotus made as a result of that reliance (Complaint, pp. 23-24, par. 110-15; and see, par. 13,

above, and citations to Complaint, Declarations and Exhibits therein).

### Veil Piercing

68. Bearing in mind that the plaintiffs have not had the opportunity to conduct discovery

in this action as the result of the defendants' default, the plaintiffs' allegations and proof also

sufficiently establish the basis for piercing Gholian Enterprises' corporate veil in order to hold

Gholian and Akush liable for Gholian Enterprises' debts to the plaintiffs under the plaintiffs'

Fifteenth Claim (Complaint, pp. 28-29, par. 145-52).

69. Gholian and Akush held themselves out to be the owners, directors and/or officers of

Gholian Enterprises (See par. 3, above, and citations to Complaint and Declarations therein).

70. Both the dominance of Gholian and Akush over Gholian Enterprises, and their abuse

of the privilege of doing business in the corporate form is established by their free use of Gholian

Enterprises as a vehicle for committing repeated frauds against the plaintiffs over the period of more than one year (Complaint, pp. 28-29, par. 145, 150; see par. 4-21, above, and citations to Complaint, Declarations and Exhibits therein).

71. Moreover, Gholian Enterprises' lack of sufficient capital while Gholian and Akush carried out their fraudulent scheme can easily be discerned from the evidence showing that Gholian Enterprises' checks were worthless, and its bank accounts were closed (Complaint, p. 28, par. 147; see par. 9-11, 20, above, and citations to Complaint, Declarations and Exhibits therein).

72. Furthermore, since they have defaulted, Gholian and Akush have in effect admitted the allegations that they ignored the corporate formalities of Gholian Enterprises by failing to hold required meetings and elections, and failing to keep minutes, and that they intermingled Gholian Enterprises' assets with their personal assets (Complaint, p. 28, par. 146, 148).

## **Damages**

## **Compensatory Damages**

## **Standards**

73. Under New York law, the compensatory damages recoverable for fraud (including for a civil conspiracy to commit fraud, and promissory estoppel are "reliance" or "out-of-pocket" damages), *i.e.* the amount that the plaintiff lost as the result of the fraud or its performance in reliance on the defendant's promise, and do not include lost profits.  Negrete v. Citibank, N.A., 759 Fed. Appx. 42,48 (2d Cir. 2019)(fraud); Cyberchron Corp. v. Calidata Systems Development Inc., 47 F.3d 39,46 (2d Cir. 1995)(promissory estoppel).

74. However, the standard for determining damages for a breach of contract is the " '

"amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract' ' " (White Lines Com LLC v. Winnington Networks Limited, 2015 WL 7288640 *2 [S.D.N.Y. 2015][quoted source omitted]), which can include reasonably forseeable consequential or incidental damages, including lost profits.  See Mongiello's Italian Cheese Specialties, Inc. v. Euro Foods Inc., 2018 WL 4278284 *38-39 (S.D.N.Y. 2018).

75. The rule concerning contract damages also applies to claims upon accounts stated since an account stated is " 'an alternative theory of liability to recover the same damages allegedly sustained as a result of the breach of contract.' " Episcopal Health Servs., Inc. v. POM Recoveries, Inc., 138 A.D.3d 917,919, 31 N.Y.S.3d 113 (2nd Dept. 2016).

76. Pursuant to N.Y. U.C.C. 2-709(1) the damages recoverable on an action for the price of goods sold and delivered is "the price," plus any incidental damages, which, pursuant to N.Y. U.C.C. § 2-710, "include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach."

77. Veil piercing is not an "independent" cause of action under New York law; it is an equitable too for holding a defendant liable to the plaintiff for whatever amount the corporation owes to the plaintiff.  See Morris v. New York State Dept. of Taxation and Finance, 82 N.Y.2d 135,140-41, 603 N.Y.S.2d 807, 810 (1993).

## The Plaintiffs' Damages

### Unique Lotus

78.  Unique Lotus has shown that it sold and delivered gem stones to Gholian Enterprises

22

having a total price of $382,796.50, against which it received payments totaling $31,963.20, and recovered stones having a total price of $86,648.50 (see par. 22A-22F, 23A-23D, above, and citations to Declarations and Exhibits therein).

79. The unpaid portion of the price of the gem stones that Unique Lotus sold and delivered to Gholian Enterprises is therefore $264,184.90 ($382,796.50 - $31,963.20 - $86,648.50).

80. Unique Lotus was also incidently required to pay a bank fee in the amount of $32.29 as the result of a Gholian Enterprises check that bounced (see par. 22G, above, and citations to Declarations and Exhibits therein).

81. The total of the damages which Unique Lotus is entitled to recover from Gholian Enterprises for breach of contract, and the price of the goods that it sold and delivered to Gholian Enterprises is $264,217.09 ($264,184.90 + $32.29).

82. Unique Lotus is also entitled to recover that amount of $264,217.09 from Gholian and Akush under its veil piercing claim.

83. In addition, Unique Lotus paid $40,000.00 in cash to redeem five consigned stones as a result of the defendants' fraud, and is therefore entitled to recover that amount from all of the defendants as reliance damages (see par. 22H, above, and citations to Declarations therein).

84. The total amount of compensatory damages that Unique Lotus is entitled to recover from each of the defendants is therefore $304,217.09 ($264,217.09 + $40,000.00) (see par. 24 above, and citations to Declarations therein).[2]

---

[2] Alternatively, Unique Lotus should be awarded $303,062.00, which is the amount that the defendants' agreed was owing in the settlement agreement executed by Gholian on February 16, 2017; none of that amount was paid (see Fifth and Sixth Claims, Complaint, pp. 21-22, par.

**Gemdiam**

85. Gemdiam has shown that it is entitled to recover $48,600.00 from Gholian

Enterprises, Inc., as the price of the 5.40 carat emerald that Gemdiam consigned and and

delivered to Gholian Enterprises on or about December 22, 2016, and then sold to Gholian

Enterprises on or about January 31, 2017 (see par. 25E, above, and citations to Declarations and

Exhibits therein).

86. Gemdiam is also entitled to recover its lost profits, in the amount of $13,894.00, for

the two emeralds that it sold and delivered to Gholian Enterprises on or about September 13,

2016, and the amount of $59,300.00 for the 11.86 carat emerald that it sold to Gholian

Enterprises on or about December 22, 2016, since even though Gemdiam recovered those stones

by virtue of its redemption payments, it lost the benefit of its bargains (see par. 25B, 25D, above,

and citations to Declarations and Exhibits therein).

87. The total of the damages which Gemdiam is entitled to recover from Gholian

Enterprises for breach of contract, and the price of the goods that it sold and delivered to Gholian

Enterprises is therefore $121,794.00 ($48,600.00 + $13,894.00 + $59,300.00).

88. Gemdiam is also entitled to recover that amount of $121,794.00 from Gholian and

---

90-94, 96-99; and see par. 18-20, above, and citations to Complaint, Declarations and Exhibits
therein).  In addition, Akush can be held personally liable to Unique Lotus under the plaintiffs'
Eighth and Ninth Claims, in the amounts of $112,666.00 and $40,000.00 respectively, for
breaching his personal contractual obligations under the consignment memoranda that he signed,
and for failing to fulfill his personal promise to reimburse Unique Lotus for its $40,000.00
redemption payment (Complaint, pp. 23-24, par. 106-08, 110-115; and see par. 8, 13, 22C, 22F,
23D above, and citations to Complaint, Declarations and Exhibits therein).

Akush under its veil piercing claim.[3]

89. In addition, Gemdiam paid $52,000.00 in cash, on or about February 6, 2017, to redeem the emeralds that it sold to Gholian Enterprises on or about September 13, 2016, and borrowed $120,000.00, on or about June 12, 2017, to redeem the 11.86 carat emerald sold to Gholian Enterprises on or about December 22, 2016, as a result of the defendants' fraud, and is therefore entitled to recover $172,000.00 from all of the defendants as reliance damages (see par. 25A, 25C, above, and citations to Declarations and Exhibits therein).

90. However, the defendant are entitled to a credit in the amount of $46,322.00 which Gholian Enterprises paid to Gemdiam towards the price of the emeralds purchased on or about September 13, 2016 (see par. 26, above, and citations to Declarations and Exhibits therein).

91. The total amount of compensatory damages that Gemdiam is entitled to recover from the defendants is therefore $247,472.00 ($121,794.00 + $172,000.00 - $46,322.00) (see par. 27, above, and citations to Declarations therein).

## The Total of the Plaintiffs' Compensatory Damages

92. The total of the compensatory damages that the plaintiffs are entitled to recover from the defendants is $551,689.09 ($304,217.09 + $247,472.00)(see par. 28, above).

## Punitive Damages

93. Under New York law, punitive damages may be awarded for a fraud " 'which is not simply intentional but evinces a high degree of moral turpitude.' " Winklevoss Capital Fund,

---

[3] Akush can also be held personally liable to Gemdiam in the amount of $48,600.00 under the plaintiffs' Fourteenth claim for breaching his personal contractual obligations under the consignment memoranda that he signed (Complaint, p. 27, par. 141-43; and see par. 8, 25E, above, and citations to Complaint, Declarations and Exhibits therein).

LLC, 351 F.Supp.3d 710,716 (S.D.N.Y. 2019), quoting Ross v. Louise Wise Services, Inc., 8 N.Y.3d 478,479, 836 N.Y.S.2d 509,516 (2007).

94. Punitive damages may also be awarded for a civil conspiracy to commit a fraud. See Barkley v. United Homes, LLC, 2012 WL 2357295 *15 (E.D.N.Y. 2012), aff'd sub nom Barkley v. Olympia Mortgage Co., 557 Fed.Appx. 22 (2d Cir. 2014).

95. Punitive damages are appropriate in this case because the defendants' conduct, which was directed at multiple victims over a protracted period of time, was " 'so flagrant as to transcend mere carelessness.' " Barkley v. Olympia Mortgage Co., supra, 557 Fed.Appx. at 26.

### Pre-Judgment Interest

96. "The recoverability of prejudgment interest is governed by New York law." Sole v. Knoedler Gallery, LLC., 2016 WL 5417880 *9 (S.D.N.Y. 2016), adopted 2016 WL 5468298 (S.D.N.Y. 2016).

97. New York law requires an award of pre-verdict and pre-judgment interest, at the rate of 9% per annum, on "a sum awarded because of a breach of performance of a contract, or because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property." N.Y C.P.L.R. §§ 5001; 5002; 5004.

98. Those sections have been found be mandatory, and to also apply to sums awarded fraud (Sole v. Knoedler Gallery, LLC., supra), accounts stated (La Framboise Well Drilling, Inc. v. R.J. Dooley & Assoicates, Inc., 2007 WL 430285 * [S.D.N.Y. 2007]), unjust enrichment (Ethelberth v. Choice Security Co., 2016 WL 11469536 *8 [E.D.N.Y 2007]) and promissory estoppel. Cyberchron Corp. v. Calldata Systems Development, Inc., 831 F.Supp. 94,118 (E.D.N.Y. 1993), aff'd in part, vacated in part on other grounds, 47 F.3d 39 (2d Cir. 1995).

99. "Prejudgment interest 'is to be computed from "the earliest ascertainable date the cause of action existed." ' " <u>Sole v. Knoedler Gallery, LLC,</u>, <u>supra</u> (quoted sources omitted).

100. Although an earlier start date might be appropriate in this case, the plaintiffs have requested that interest run from July 10, 2017, which is the date on which the first of the post-dated checks drawn on the Gholian Enterprises Inc.'s closed account at China Citik Bank, was deposited, at the end of the transactions described in the Complaint.

101. At 9% per annum, daily interest on $551,689.00 would be $136.03 per day ($551,689.09 x .09 = $49,652.02 (annual interest) ÷ 365 = $136.03 (daily interest).

## Costs

102. Fed. R. Civ. P. Rule 54(d)(1) provides that, "[u]nless a federal statute, these rules, or a court order provides otherwise, costs–other than attorney's fees–should be allowed to the prevailing party.

103. The term "costs" includes fees of the clerk and the marshal. <u>Gotlin v. Lederman</u>, 616 F.Supp.2d 376,398 (E.D.N.Y. 2009), <u>aff'd in part, vacated in part on other grounds sub nom</u> <u>Gotlin ex rel. County of Richmond v. Lederman</u>, 483 Fed.Appx. 583 (2d Cir. 2012).

104. The plaintiffs' costs and disbursements in this action should therefore be taxed and added to the amount of the judgment at the time of entry.

## Conclusion

105. The plaintiffs are entitled to a judgment awarding them compensatory damages in the total amount of $551,689.09 ( including $304,217.09 for Unique Lotus Gems and $247,472.00 for Gemdiam) against all three defendants jointly and severally.  The plaintiffs are also entitled to an amount of punitive damages, in an amount to be determined by the Court.

27

Prejudgment interest should run on the amount awarded at the rate of 9% per annum from July 10, 2017 ($136.03 per day on the principal amount of $551,689.09), to be taxed by the Clerk of the Court upon entry of judgment, along with the plaintiffs' costs and disbursements.

Dated: New York, New York
      July 11, 2019

Stuart L. Sanders, Esq.
KAZLOW & KAZLOW
Attorneys
237 W. 35th Street, 14th Floor
New York, NY 10001
(212) 947-2900